IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of<br>H.L.<br><br>STATE OF WASHINGTON,<br><br>          Respondent,<br><br>    v.<br><br>H.L.,<br><br>          Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 72634-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br>FILED: November 9, 2015 |

SCHINDLER, J. — H.L. appeals a 90-day involuntary commitment order. H.L. contends insufficient evidence supports finding she was "gravely disabled" under RCW 71.05.020(17)(a). We disagree, and affirm.

On September 25, 2014, a designated mental health professional, Navos Inpatient Services clinical psychologist Dr. Julia Singer, filed a petition to commit H.L. for up to 14 days of treatment. The petition alleged H.L. posed "a likelihood of serious harm to others," and H.L. was gravely disabled as a result of a mental disorder and "in danger of serious physical harm, resulting from a failure to provide for . . . her essential human needs of health or safety." H.L. did not dispute the allegations in the petition. On September 26, the superior court entered an agreed 14-day involuntary commitment order for treatment at Navos.

On October 6, Dr. Singer filed a 90-day petition to commit H.L. for additional treatment. The petition alleged that H.L. "was taken into custody as a result of conduct in which . . . she attempted or inflicted physical harm upon the person of another or . . . herself . . . and continues to present, as a result of a mental disorder, a likelihood of serious harm," and that H.L. was "gravely disabled." The petition states, in pertinent part:

> [H.L.] has a mental disorder with paranoia, delusional thinking, mood lability, agitation, auditory hallucinations, and impaired judgment and impulse control. She has a history of hospitalizations, as well as a history of assaultive behavior. She reportedly went missing several months ago and ended up psychiatrically hospitalized for six months in Paris. Upon her return to Seattle she went to the [emergency room] seeking help, but became angry and threw her purse at the social worker without warning. She threatened to slap her mother, whom she has assaulted in the past. She stated she could not go to her apartment because of the ghosts there. She was too impaired to formulate a plan for meeting her basic needs safely.
>
> In the hospital she is gradually stabilizing but her thinking remains delusional and tangential. She continues to report auditory hallucinations and is observed responding to internal stimuli. She is unwilling to return to her apartment due to her continued belief that the ghosts are related to the apartment rather than to her illness. Although she is medication compliant, her judgment and insight remain impaired. If she were released prematurely she would be at risk of discontinuing her medications and deteriorating further, endangering others and remaining unable to care safely for her basic needs in the community. [90-day more restrictive involuntary treatment] is currently recommended, until she is sufficiently stabilized to engage in court-ordered outpatient treatment.

The superior court held a bench trial on the 90-day involuntary treatment petition beginning at 1:30 p.m. on October 22. Throughout the entire trial, H.L. interrupted numerous times by "yelling and screaming."

2

At the beginning of the trial, the State moved to amend the petition to allege H.L. threatened, inflicted, or attempted to inflict physical harm to others and herself after commitment for evaluation and treatment. H.L. did not object to amending the petition.

Dr. Singer testified that H.L. suffered from paranoid schizophrenia and exhibited "[d]elusional thinking" and "auditory hallucinations." Dr. Singer stated H.L. "is labile to the point of agitation. Her thought process is tangential. Recently she has been voicing depression and suicidal ideation." Dr. Singer stated that although H.L. was initially "calm" and cooperative," "[r]ecently she has been significantly worse" and "all over the map . . . with plans for how she will care for herself."

Dr. Singer testified regarding H.L.'s behavior while hospitalized at Navos. On October 16, Navos staff placed H.L. in seclusion after observing H.L kissing a male patient. On October 17, H.L "threw a tray at staff." The psychiatric progress notes from October 19 indicated that H.L. refused all morning medications and "hugged and kissed [a male patient] without any evident context."

Dr. Singer testified that on October 20, H.L. repeatedly yelled that she was going to kill herself. A short time later, Dr. Singer observed H.L. "screaming" at the American Medical Response (AMR) drivers and threatening to kill them.

During a meeting with social services on October 21, H.L. yelled that she wished her mom would die. When the social service worker explained that H.L. would be unable to obtain housing if she continued to yell when stressed, H.L. said that she "wanted to die, that she did not want this life." H.L. stated that she wanted to kill herself and did not want medications. H.L. yelled and banged on a chair so loudly that Navos staff responded out of concern for the safety of the staff member.

Dr. Singer testified the morning of October 22, H.L. was "verbally abusive" and threw her shower supplies at Navos staff. When the staff attempted to direct H.L. to her room, she punched a staff member in the chest and left arm.

Dr. Singer testified H.L was recently psychiatrically hospitalized for six months in Paris, France. While hospitalized in France, H.L. received a prescription for Olanzapine. After the United States Embassy transported H.L. back to the United States, she "immediately ended up back in the hospital."

Dr. Singer testified that due to her mental impairment, H.L. was unable to develop a consistent and coherent plan for taking care of herself outside of the hospital setting. Dr. Singer told the court that H.L. had an apartment but refused to live there. Dr. Singer stated that the alternatives H.L. suggested regarding where she would live if released from the hospital "vary minute by minute" and there seemed to be a "high likelihood" she would "tak[e] off, once again, when she is really not able to care for herself, even here with supports."

Dr. Singer testified that as a result of her mental disorder, H.L. presented a "substantial risk of physical harm to others," was "in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety," and was "gravely disabled." Dr. Singer stated that her conclusion was based in part on H.L.'s inability to present a coherent and consistent plan regarding where she would live after leaving the hospital. Dr. Singer also believed H.L.'s "sexually aggressive behavior" could lead to H.L. being sexually assaulted if she left the Navos facility.

H.L. testified that her prescribed medication made her feel physically ill, emotional, and depressed.

At the conclusion of the testimony, the State withdrew the allegations related to precommitment acts creating a risk of harm.

The court found Dr. Singer credible and that the Navos medical records supported her testimony. The court found that H.L. suffered from a mental impairment, paranoid schizophrenia. The court found by clear, cogent, and convincing evidence that H.L. continued to present a likelihood of serious harm to herself and others[1] and that H.L. was gravely disabled under RCW 71.05.020(17)(a).

> The court also finds that she is gravely disabled. She remains highly delusional, psychotic, angry, and hostile. She continues to scream and yell when met with restraints or limits or stressful situations. Because of her mental impairment, she is unable to develop a coherent plan for taking care of herself outside of a hospital setting. She is unable to find housing on her own, refuses to return to her apartment because she believes it's inhabited by ghosts.
>
> . . . .
>
> . . . She has fled the country once, leading to her hospitalization in France . . . and being prescribed . . . Olanzapine. She is verbalizing a plan to leave the country again . . . if discharged. . . . But she has demonstrated that she is unable to care for herself if she were released. . . . She has no other housing at the moment, and at times insists she will not go to a shelter — . . . at other times she says she will go to a shelter. The court agrees with Dr. Singer's opinion that she currently is too symptomatic to be able to find adequate shelter on her own without substantial assistance through her treatment provider.

The court entered an order remanding H.L. into the custody of Navos for "a further period of intensive treatment not to exceed 90 days from the date of judgment."

---

[1] The court ruled:

> The court also finds that as a result of this mental impairment, she does currently present a substantial risk of harm to herself and to others, based on the following findings: She is currently highly impulsive and has been in seclusion at Navos very recently because of her uncontrolled behavior. She is throwing items at staff at Navos. She physically struck a staff member this morning. She has gotten agitated extremely easily. She has repeatedly threatened to harm herself, her mother, and the AMR crewmembers. She remains highly labile, yelling and screaming throughout even the court proceedings. This is sufficient to establish that she presents currently a risk of harm to herself and to others.

H.L. appeals the 90-day commitment order. H.L. contends insufficient evidence supports the finding that she was "gravely disabled" under RCW 71.05.020(17)(a).

Preliminarily, the State asserts the appeal is moot. We disagree. "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012). Under chapter 71.05 RCW, the superior court considers the history of recent prior civil commitments. See RCW 71.05.012 ("consideration of prior mental history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety"); RCW 71.05.212(1)(d) ("Whenever a designated mental health professional . . . is conducting an evaluation under this chapter, consideration shall include all reasonably available . . . records regarding . . . [p]rior commitments under this chapter."); RCW 71.05.245 ("(1) In making a determination of whether a person is gravely disabled, presents a likelihood of serious harm, or is in need of assisted outpatient mental health treatment . . . , the court must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior. . . . (3) In making a determination of whether there is a likelihood of serious harm . . . , the court shall give great weight to any evidence before the court regarding whether the person has: . . . (b) a recent history of one or more commitments.").

Because the appeal is not moot, we address the merits of the appeal. The State alleged H.L. was gravely disabled under RCW 71.05.020(17)(a). RCW 71.05.020(17)(a) provides that an individual is "gravely disabled" when, as a result of a

mental disorder, the individual "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety."

To meet the burden of establishing an individual is gravely disabled under RCW 71.05.020(17)(a), the State must present "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment." In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986). The State must also show the failure or inability to provide for essential needs presents "a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05.

"[W]e will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." LaBelle, 107 Wn.2d at 209. Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. In re Det. of H.N., 188 Wn. App. 744, 355 P.3d 294, 303 (2015).

H.L. contends the court based the finding of grave disability, in part, on her lack of housing and ignored the evidence showing she was willing to work with her treatment team to find housing, stay with a friend, or live in a shelter. We disagree.

The record shows sufficient evidence supports finding that H.L. was gravely disabled under RCW 71.05.020(17)(a). The court found that H.L. was gravely disabled based on the undisputed evidence that H.L. remained delusional, psychotic, angry, and hostile. As a result of her mental disorder, the court found H.L. was unable to develop a consistent and coherent plan for taking care of herself outside of the hospital setting and

7

was too symptomatic to find adequate shelter on her own. The record supports this finding.

Dr. Singer testified that H.L. provided varying explanations of where she would live after her hospitalization. Dr. Singer stated that H.L. had an apartment but was "a hundred percent consistent" in refusing to live in the apartment because she "saw ghosts and heard voices there." In September, H.L. expressed interest in mental health housing. On October 9, H.L. stated that she "could go stay with her mother's friend until she could get another apartment." On October 20, H.L. said that she planned to "live with her father on Delridge Way" but the telephone numbers she provided Dr. Singer did not belong to her father. Later on October 20, H.L. told Dr. Singer that rather than finding housing, she "was going to go on a vacation" to Canada. On October 21 when asked by a social worker where she would live after leaving Navos, H.L. stated she "would just be homeless" but insisted that she would not live in a shelter.

Dr. Singer noted that because H.L. refused to return to her apartment, she had "no other alternative" source of housing. Dr. Singer testified that the alternatives H.L. offered "seem to be made up" and "vary minute by minute." The fact that H.L. had "no clear shelter plans and [a] propensity for fleeing the country" was "very concerning." According to Dr. Singer, H.L. was "just clutching at ideas" and had "no reality basis on what it would mean to go out in the current weather and find her way to a place to stay warm and dry tonight, let alone down the road."

The evidence supports the court's determination that H.L. "has no other housing at the moment" and "is too symptomatic to be able to find adequate shelter on her own." The evidence supports the determination that H.L. was in danger of serious physical

8

harm resulting from a failure to provide for her essential human needs and was gravely disabled under RCW 71.05.020(17)(a).

We affirm.

WE CONCUR: